Filed 4/25/13  P. v. Tuck CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055503 |
| v. | (Super.Ct.No. RIF10001848) |
| ELVIS ARMANDO MART TUCK, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Edward D. Webster, Judge.  Affirmed with directions.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kathryn Kirschbaum, Deputy Attorney General, for Plaintiff and Respondent.

A jury found defendant Elvis Armando Martinez Tuck guilty of active

1

participation in a criminal street gang (Pen. Code,[1] § 186.22, subd. (a)), but could not reach a verdict on a charge of murder (§ 187, subd. (a)), involving discharge of a firearm (§ 12022.53, subd. (d)), committed for the benefit of a street gang. (§ 186.22, subd. (b).) After the court declared a mistrial on the murder count, retrial proceedings commenced, but the People agreed to dismiss the murder charge in return for the defendant's admission of several prior convictions and his agreement to a stipulated sentence, as well as a waiver of defendant's appeal rights. Defendant was sentenced to an aggregate term of 13 years of prison, waived 365 days of presentence custody credit pursuant to the agreement, and appealed, notwithstanding the waiver of appeal rights.

## BACKGROUND

In January of 2010, Lynn Bowman lived at an address in Riverside with her four-year-old daughter, her mother, her friend Stephanie, and Stephanie's sister. The house was a known drug house where people went to do methamphetamine, smoke marijuana, and drink alcohol. Codefendant Eugene Garcia, known to Lynn as "Stony," but who was also called "Darky," came to the house frequently to use drugs with Lynn.

Lynn's boyfriend in January 2010 was Joseph Romero, a member of the West Side Riva gang, known by the moniker "Hobo." Hobo had been in jail until December 2009. Upon his release from jail on December 29, 2009, Hobo resumed his relationship with Lynn and lived with her. Hobo did not like all the people coming over to the house to use

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

drugs and got angry.  He would be very rude to people at the house and became very controlling over Lynn.  At some point, Lynn and Hobo broke up and Hobo moved out.

Hobo wanted to get back together with Lynn after the breakup, and continued to come over to visit with Lynn's daughter.  He also followed Lynn in a car.  On occasion Hobo bragged about the fact that he had been in protective custody while incarcerated.  Since sex offenders and snitches were usually the types of person put in protective custody, Hobo's claim that he was "PC" was viewed negatively.  One such occasion occurred on approximately January 2, 2010, when Darky was present.

On January 5, 2010, several people were at Lynn's house using drugs.  Stoney was there earlier in the day with someone called Cloudy.  A friend named Manuel was there also.  At some point, Hobo came over two times during the afternoon with Cale McMillin,[2] whom Lynn referred to as "Kato."  The first time Hobo came to the house, everyone got along.  The second time Hobo and Kato came over was in the evening, and Stoney was there, as was Manuel.  Hobo got everyone out of Lynn's room because he was angry that a lot of people were there and he wanted to talk to Lynn.  Hobo dropped off some drugs and alcohol for Lynn and she saw a gun in his pocket.  Hobo usually carried a gun with him.

The two talked in Lynn's room for about a half an hour.  Hobo was talking loudly enough for everyone to hear, referring to the others at the house as "fools" who did not

---

[2]  Cale had no recollection of going into the house on either of the two earlier visits to Lynn's residence.

care about her or her child. Hobo was known to have a bad temper. Hobo gave Lynn an ultimatum, telling her that he would be back in three hours and that she should be ready to go with him. As Hobo walked out he said he would be back. As he left the house, Kato went with him, with Hobo driving crazily, doing donuts in the front yard. Lynn stayed in her room for about an hour, and when she came out, Stoney, Manuel, and Cloudy were no longer there.

Lynn had a bad feeling. She tried to call the telephone number Hobo had called her from, and spoke to a girl Hobo had been seeing. Lynn told her not to let Hobo come over, that it was dangerous and he should not be around her house. Subsequently, Hobo and Kato drove up, skidding to a stop in the gravel near her house. Lynn went out to the car to speak to him. She told Hobo she did not want to be with him anymore and told him repeatedly to leave.

While Lynn spoke to Hobo, she saw a white car pull up behind a burgundy van. The white car belonged to Manuel, who parked at an angle. At the end of the street, Lynn saw a truck pull into the area. Three people got out of the truck, walked through the field near Lynn's house. They wore hooded sweatshirts and carried guns. As they walked towards Hobo's vehicle (an SUV), Lynn urged Hobo to leave. Lynn saw Hobo reach underneath his seat; she believed he pulled a gun from that area and put it on his lap. Manuel Lopez, in the other vehicle, heard loud voices near the SUV, heard shots, and looked in his mirror to see an arm and muzzle blast coming from the SUV.

4

Hobo and Kato pulled away and started to drive away. Lynn ran. One of the three individuals spread out from the other two. The one person walked to the front of Hobo's vehicle while the other two went around to the rear. The person walking in front of the vehicle had acne or some kind of blemish on his face. As Hobo took off and as Lynn got to her door, she heard three gunshots. The first shot was louder than the other two. After Hobo left, Manuel left in his car. As Lynn ran into the house, she heard one of the females who were outside at the time yell, "F--- that fool." "He's PC," or similar words. After the shooting, Cloudy also said "F--- Hobo. He's PC."

Cale was riding in the car with Hobo and heard a shot as Hobo pressed the accelerator. As they drove away, Cale asked Hobo if he was okay, and Hobo eventually responded that he had been hit. Then Hobo let go of the steering wheel, stepped on the accelerator, and made snoring sounds. Cale grabbed the steering wheel, and the car stopped after going through an intersection. A bystander called 911. When police arrived, Cale initially claimed he was merely walking by when the SUV pulled into a driveway with a driver slumped over, but he later admitted to being in the car with the victim, Hobo, and directed law enforcement officers to the location of the shooting.

Joseph Romero, Hobo, had suffered two gunshot wounds: one shot penetrated his left kidney, while the second bullet entered the lower lobe of his left lung, hitting the pancreas and aorta, and resting in the musculature of the abdominal wall. Gunshot residue was found on the victim's hands, consistent with discharging a weapon, or being

5

in an environment of gunshot residue, or receiving the particles from an environmental source.

In March 2010, detectives received a letter from a prison inmate at the California Institute for Men at Chino[3], who was a former cellmate of Garcia's (codefendant), and who had information about the homicide of Hobo, also known as Joseph Romero. Favio Contreras had been housed with Eugene Garcia, the codefendant, who introduced himself as "Darky" and claimed to be the president of the Corona 4th Street VNS gang. Darky had been incarcerated for a parole violation.

While sharing the cell, Darky told Favio about the homicide of Hobo, a member of East Side Riva, in January 2010. Darky told Favio that he and Hobo were enemies because Hobo was in PC, and because Darky was going out with Hobo's girlfriend, Lynn. Darky and Lynn called Hobo to cover to meet them, while Darky and his co-participant, the defendant, Darky's brother, known as "Lil' Man," waited for him. They waited at the house with two other "homies" of Darky.

Darky went on to tell Favio that when Hobo came over, Darky and Lil' Man were hiding, one in the back and one in the front; they thought Hobo had a gun. Darky and his associates were armed also. When Hobo drove up, Lynn came out of the house and went to the driver's side of the vehicle to speak to Hobo. While she was talking to Hobo, Darky shot him from behind. After Darky shot Hobo with a .22 rifle, his brother, the

---

[3] The inmate referred to it as Chino State Prison.

defendant, shot him with a nine-millimeter handgun through the windshield, hitting Hobo in the chest.

The defendant[4] was charged by an amended information with one count of murder (§ 187, subd. (a)), with an allegation that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)), and an allegation that defendant personally used a firearm in the commission of the offense. (§ 12022.53, subds. (d), (e).) In count 2, defendant was charged with active participation in a criminal street gang. (§ 186.22, subd. (a).) It was further alleged that defendant had suffered three prior convictions for which he had served prison sentences (§ 667.5, subd. (b) [prison priors]), one prior conviction for a serious felony (§ 667, subd. (a) [nickel prior]), and one prior conviction for criminal threats (§ 422) under the Three Strikes law.

At trial, defendant presented an alibi defense to the murder, with family members testifying that health problems kept him at home on the date of the murder. Garcia, the codefendant, testified in his own defense that he was involved in a relationship with Lynn while Hobo was in jail, but he stepped aside when Hobo was released so Hobo could resume with Lynn. Garcia knew that Hobo was jealous, that he carried a gun, and that he was trying to find out who Lynn had been with while he was in jail.

Garcia testified that on the day of the shooting, Hobo came out of Lynn's house angry and upset, and drove away after giving Garcia a dirty look. Lynn warned Garcia

---

[4] Defendant's step-brother, Eugene Garcia (Darky) was also charged, and the cases were consolidated. However, Garcia is not involved in this appeal.

7

that Hobo would kill him. After Garcia asked Manuel to take him to his house to pick up some clothes, they stopped by a friend's house (Rudy), and Garcia asked Rudy for some help with the situation. The three went back to Lynn's address where they saw Hobo pull up and saw Lynn go out to the car to talk with him. Garcia heard Lynn tell Hobo to leave, and then he heard Hobo tell Lynn to get out of the way. Hobo "mad-dogged" Garcia through the side mirror of his car, and then drove slightly forward; Garcia heard a "boom" and shot back with a revolver. Garcia feared for his life when he saw the way Hobo looked at him. Garcia denied telling Favio (aka "Flaco") that his brother was involved in anything, although he acknowledged telling Flaco that he had a brother named Elvis Tuck who was known as "Lil' Man."

Following trial, the jury, which deliberated for five days, was unable to reach a verdict on the murder and related charges in count 1, resulting in a mistrial on that count. The jury found defendant guilty of count 2, the active participation in a street gang charge. When proceedings resumed for retrial of the murder count, the parties reached a resolution. As to defendant, the People agreed to dismiss count 1 in return for defendant's admission of all prior conviction allegations, as well as his waiver of 365 days of presentence custody credits[5] in return for a stipulated term of 13 years in prison, and a waiver of defendant's appeal rights.

---

[5] The People were seeking 14 years in custody, but that number could only be achieved by imposing a 13-year term with a waiver of 365 days previously served.

Defendant admitted the prior conviction allegations pursuant to the agreement, and waived his right to appeal. The People dismissed count 1 following defendant's admissions. The court sentenced him to the upper term of three years for count 2, doubled under the Strikes law to six years. The court then imposed a five-year term for the nickel prior enhancement, and two years for the two prison priors, for a total sentence of 13 years in prison. The court awarded defendant 249 days credit for time actually spent in presentence custody, plus 37 days conduct credits pursuant to section 2933.1.

On January 20, 2012, defendant filed a notice of appeal along with a request for a certificate of probable cause. The trial court denied the certificate of probable cause on January 23, 2012.

## DISCUSSION

Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 [87 S.Ct. 1396, 18 L.Ed.2d 493] setting forth a statement of the case, a summary of the facts, and potential arguable issues, and requesting that we undertake an independent review of the entire record.

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error. Our independent review leads us to conclude that the court erroneously calculated defendant's conduct credits. We requested supplemental briefing from the parties. We conclude that because defendant's conviction of active participation in a criminal street gang, pursuant to section 186.22,

9

subdivision (a), is not a violent felony, defendant was entitled to presence credits pursuant to section 4019, not section 2933.1, but he is not entitled to day-for-day credits.

**1. Defendant is Entitled to Section 4019 Credits For Presentence Custody**.

a. **Sentencing Information**

Prior to the imposition of the sentence, the court and both counsel discussed the number of days of credit for time served. In order to comply with the People's requirement that defendant serve 14 years in incarceration, defendant had to waive 365 days of credit for time served. The parties discussed the conduct credits, assuming that defendant earned only 15 percent credits pursuant to section 2933.1. After advising defendant of the rights he was waiving and the consequences of the plea, the court informed defendant he would be given credit for 249 days actual time and 37 days of conduct credit pursuant to section 4019.

As the proceedings went on, the defendant asked questions about the impact of the current conviction upon his status as a second striker, and whether he would serve 80 percent of his time. After the court explained the credits under the Strikes law, codefendant's counsel stated that he believed the defendant would be serving 85 percent, tacitly referring to section 2933.1. The court disagreed because section 186.22, subdivision (a), is not a violent felony, listing the offenses that qualify as violent felonies. Thus, the court concluded defendant would serve 80 percent of his sentence.

However, when the court actually pronounced sentence, it awarded defendant 249 days credit for time actually served, and "37 days 2933 time for a total of 286 days." The

10

court awarded defendant credits at 15 percent of defendant's presentence custody time. Because the court had previously determined that the current offense was not a violent felony, we conclude it inadvertently awarded the reduced amount of presentence conduct.

### b.       Legal Discussion

The Three Strikes law imposes a 20 percent limitation on sentence credits. (§§ 667, subd. (c)(5), 1170.12, subd. (a)(5).)  However, the limitation on credits applicable to sentences imposed under the Strikes law applies only to post-commitment credits.  (*People v. Henson* (1997) 57 Cal.App.4th 1380, 1385, fn. 5].)  Except where section 2933.1 applies, a defendant sentenced under the Strikes law is entitled to presentence credits pursuant to section 4019.  (*People v. Buckhalter* (2001) 26 Cal.4th 20, 32, citing *People v. Thomas* (1999) 21 Cal.4th 1122, 1125; *People v. Hill* (1995) 37 Cal.App.4th 220, 225-227.)

Only when the current offense is a violent felony as defined in section 667.5, subdivision (c), is a defendant's presentence custody credit limited to 15 percent. (*People v. Thomas, supra,* 21 Cal.4th at p. 1130.)  Here, the defendant's current offense is not a violent felony within the meaning of section 2933.1, so he was entitled to § 4019 credits.  The trial court acknowledged as much prior to pronouncing sentence, but inadvertently stated that defendant's credits should be calculated in accordance with section 2933.1.  The defendant is entitled to presentence credits according to the appropriate version of section 4019, to which we now turn.

11

**2.     Under Senate Bill No. 18, Operative January 25, 2010, Defendant is entitled to Six Days Credit for Every Four Days Served Pursuant to Section 4019.**

In supplemental briefing, the defendant argues he is entitled to the more liberal credits provided under the amended version of section 4019 enacted as part of the Criminal Justice Realignment Act, effective October 1, 2011.  The People argue that the defendant committed his crime prior to the effective date of Senate Bill 18 (2009 Stats., ch. 28, § 50), so his credits must be calculated under the version of the statute in effect on the date of his offense.  We disagree with both assertions.

Section 4019 provides that a criminal defendant may earn additional presentence credit against his or her sentence for performing assigned labor (§ 4019, subd. (b)), and for complying with applicable rules and regulations.  (§ 4019, subd. (c); *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.)  Prior to January 25, 2010, section 4019 provided, in relevant part, that a term of six days would be deemed to have been served for every four days spent in actual custody.  (Former version of § 4019, subd. (f), as amended by Stats. 1982, ch. 1234, § 7, pp. 4553, 4554.)  No reference was made to the date of the offense or dates of custody under this version.

Effective January 25, 2010, Senate Bill 18 contained an amendment to section 4019, increasing the amount of presentence custody a defendant could earn.  (2009 Stats., ch. 28, § 50.)  As amended, subdivision (f) of section 4019 provided that, "It is the intent of the Legislature that if all days are earned under this section, a term of four days will be deemed to have been served for every two days spent in actual custody, except that a

12

term of six days will be deemed to have been served for every four days spent in actual custody for persons described in paragraph (2) of subdivision (b) or (c)." (Stats. 2009, ch. 28, § 50, amending § 4019, subd. (f).)

Not everyone was entitled to the enhanced credit provisions under Senate Bill 18. Subdivision (b) of the January 25, 2010, amendment (Sen. Bill No. 3X 18) provides that if the prisoner is required to register as a sex offender, was committed for a serious felony, or has a prior conviction for a serious or violent felony, one day shall be deducted from his period of confinement for each six-day period for labor, and one day for good conduct. (Stats. 2009, ch. 28, § 50, amending § 4019, subds. (b)(2), (3).)

Thus, for persons convicted of sex offenses and serious or violent felonies, or who had prior convictions for a serious or violent felony, after January 25, 2010, the prisoner could earn six days credit for every four days served, while other prisoners earned four days credit for every two days served. (2009 Stats., ch. 28, § 50, amending § 4019, subd. (f).) Subdivision (f), the last subsection of the amendment to section 4019 pursuant to Senate Bill No. 18, does not include any language limiting its application to crimes committed on or after the effective date.

The January 25, 2010, amendment (Sen. Bill No. 3X 18) was held to operate prospectively only, because the increased credits were intended to provide inmates with incentive to conform, although the statute did not expressly provide that it applied to offenses committed on or after that date. (*People v. Brown* (2012) 54 Cal.4th 314, 328-329.)

13

Senate Bill No. 76 went into effect on September 28, 2010, and amending sections 2933 and 4019. (Sen. Bill No. 76; 2010 Stats., ch. 426, §§ 1, 2.) That amendment changed the language of subdivisions (f) and (g). Subdivision (f), as amended, reduced presentence conduct credits so that a defendant was deemed to have served a term of six days for every four days served. Subdivision (g) provided that, "The changes in this section as enacted by the act that added this subdivision shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after the effective date of that act." Senate Bill 76 also included an amendment to subdivision (b) of section 4019, eliminating the provisions under which persons required to register as sex offenders, person convicted of violent felonies, and persons having prior convictions for violent felonies, were ineligible for the optimal credits under section 4019. Thus, under the September 28, 2010, amendment, all prisoners earned six days credit for four days served.

In 2011, the Legislature began the arduous process of drafting and enacting the Criminal Justice Realignment Act of 2011. The bill, which was chaptered on April 4, 2011, originated with the Committee on Budget to address a fiscal emergency declared by the Governor. (See Assem. Bill No. 111, Stats. 2011-2012, ch. 16, Legis. Counsel's Digest.) The Criminal Justice Realignment Act enacted sweeping changes to long-standing sentencing laws, replacing prison commitments with county jail commitments for certain felonies and eligible defendants. (*People v. Clytus* (2012) 209 Cal.App.4th 1001, 1004.) It also included another amendment to section 4019, again increasing the

14

presentence custodial credit for incarcerated persons so that a prisoner is deemed to have served four days for every two days actually served. (Assem. Bill No. 17X, 2011 Stats. ch. 12 A, § 35.)

Subdivision (f) of section 4019 provided that a term of four days will be deemed to have been served for very two days spent in actual custody, while subdivision (g) of the amended statute provided that "[t]he changes in this section as enacted by the act that added this subdivision shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after the effective date of that act." The amendment also added subdivision (h) which provides, "The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law." The enhanced conduct credit provisions apply *only* to defendants who committed their crimes on or after October 1, 2011. (*People v. Rajanayagam, supra,* 211 Cal.App.4th at p. 52.)

In *People v. Ellis* (2012) 207 Cal.App.4th 1546, the Fifth Appellate District considered whether the final amendment, effective on October 1, 2011, applied to a defendant whose crime was committed after September 28, 2010, but before October 1, 2011. There, the defendant argued that the October 1, 2011, amendment applied, because he was sentenced after the effective date, entitling him to enhanced credits. (*Id.* at pp. 1549-1550.) The reviewing court disagreed because the plain language of the statute

15

required prospective-only application based on the date the crime was committed. (*Id.* at p. 1550.)

In *People v. Garcia* (2012) 209 Cal.App.4th 530, the defendant committed violent threats (§ 422) on May 28, 2010, when he was taken into custody. He was sentenced on January 26, 2011, and argued he was entitled to receive the enhanced credits pursuant to the January 25, 2010, amendment. The court agreed he should be sentenced under the January 25, 2010, amendment (Sen. Bill No. 3X 18), but because the defendant's current offense was a violent felony, and he had a prior conviction for a serious felony, the reviewing court concluded the defendant was entitled to two days credit for every four days actually served. (*Garcia,* at p. 536.)

Here, the January 25, 2010, amendment is the only version of section 4019 that is applicable because all subsequent amendments were expressly made applicable to crimes committed on or after their effective dates. However, the defendant has a prior conviction for criminal threats with a gang enhancement, under sections 422 and 186.22, subdivision (b), a serious felony. Pursuant to former section 4019, subdivisions (b)(2) and (c)(2), defendant was eligible to earn six days credit for every four days served. (Former section 4019, subd. (f), pursuant to Sen. Bill No. 18, 2009 Stats. ch. 28, § 50.)

We remand the matter to the superior court to calculate defendant's presentence credits, and prepare an amended abstract of judgment, reflecting the additional credit. When amending the abstract, we also direct the clerk of the court to check the box on line number 4, indicating that the defendant was sentenced under the Strikes law. The

16

amended abstract should then be forwarded to the Department of Corrections and

Rehabilitation.

## DISPOSITION

The matter is remanded to the trial court with directions to recalculate defendant's

presentence credits under former section 4019, effective January 25, 2010. The clerk is

directed to prepare an amended abstract of judgment reflecting the modified award of

presentence credits, and checking the box on line number 4, indicating that defendant was

sentenced under the Strikes law. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

KING

J.

CODRINGTON

J.

17